### RAPID ROLLER CO. v. NATIONAL LABOR RELATIONS BOARD.

#### No. 7738.

Circuit Court of Appeals, Seventh Circuit.

Feb. 2, 1942.

Rehearing Denied April 9, 1942.

**454**

Karl Edwin Seyfarth and Doval Benjamin Williams, and Charles LeRoy Brown, all of Chicago, Ill., for petitioner.

Robert B. Watts, of Washington, D. C., I. S. Dorfman, of Chicago, Ill., and David Findling, of Washington, D. C., Ernest A. Gross, Frank Donner, and William Strong, all of Washington, D. C., for respondent.

Before EVANS, KERNER, and MINTON, Circuit Judges.

MINTON, Circuit Judge.

The Rapid Roller Co. (hereinafter referred to as the company) was in 1937 and is now engaged in the city of Chicago in the manufacture and servicing of printers' rollers and in the manufacture of rubber blankets used in lithographing and offset printing. There is no dispute as to the interstate character of the company's business. The National Labor Relations Board (hereinafter referred to as the Board) on July 19, 1941, entered an order, after full and extensive hearings, findings and conclusions of law, in which the Board found the company guilty of unfair labor practices, first, by interfering with, restraining and coercing its employees in their rights to organize, in violation of Sec. 8(1) of the National Labor Relations Act, 29 U.S. C.A. § 158(1); second, by refusing on March 2, 1939 and thereafter to bargain collectively with Local 120, United Rubber Workers of America, affiliated with the Congress of Industrial Organizations (hereinafter referred to as the union); third, discrimination in the hire and tenure of striking employees and others in violation of Sec. 8(3) of the Act.

The order required the company to cease and desist from interfering with, restraining or coercing its employees in their right to organize, from discrimination in the hire and tenure of striking employees and others, and from its refusal to bargain collectively with the employees through the union. The company was also ordered to offer the striking employees immediately full reinstatement to their former or substantially equivalent positions, without prejudice to their seniority or to their other rights or privileges, and to reimburse the striking employees for any loss of pay they may have suffered by reason of the company's unlawful acts, by payment to each of them of a sum of money equal to that which he would normally have earned as wages during the period from the date of the application for reinstatement on May

9, 1939, to the date of the company's offer of reinstatement or placement on the preferential list, as provided in the Board's order, less his net earnings during such period.

To set aside this order, the company filed its petition in this court, and the Board answered and asked for an order enforcing its order.

The main question in this case, around which all others revolve, is whether or not there is substantial evidence to support the Board's order. It is axiomatic that upon such a question we do not retry the case or weigh the evidence or pass upon the credibility of the witnesses. In discharging our duty in these circumstances, we look only to the evidence that is favorable to the Board.

As stated before, the unfair labor practices of which the Board found the company guilty were: interference under Sec. 8(1); failure to bargain collectively with the union under Sec. 8(5); and discrimination under Sec. 8(3). We shall discuss these matters in this order.

Prior to the Spring of 1937, there had been no organization of the production and maintenance employees of the company. The latter part of March, 1937, a movement got under way to organize the production and maintenance employees, but the organization did not include supervisory, laboratory or office employees. Rapid progress was being made when the plant manager, Mr. Schwartz, discovered the movement. Mr. Rapport, the president of the company, was in California. Schwartz notified Rapport of the movement, and the latter came back immediately. Upon his arrival at the plant on March 29, 1937, shortly before noon and after a conference with Schwartz, he ordered a meeting of the employees around the noon hour, to be held on the fourth floor of the factory building. Rapport addressed the assembled employees, telling them that he had heard they were having trouble in regard to unionism, and stated that if they joined the union, he would move the company's plant to Rockford or Belvidere where he had a "guarantee of no labor trouble," and told the employees that the union never got them any place, that all they did was pay high dues in order for the officials to ride around in big cars and smoke cigars. He asked who the ringleaders were, and, when no one responded to his inquiry, by a strange coinci-

dence he called up before the employees for questioning four of the employees who were the most active in the organization of the union. Shortly after this meeting, Rapport was heard to say: "I will get even with these fellows who don't play ball with me. It may take me one year or it may take me five, but I will get even." Then immediately following the meeting, Rapport went through the plant and told the employees of the production and maintenance departments, where the activities for joining the union were taking place, that such employees would receive a raise of two dollars per week. The other employees in the factory who were not engaged in organization activities did not receive this promise of a raise. Rapport went to some of the leaders in the organization and asked them to stay out of the union, and offered them long-term contracts at increased wages if they would do so.

On April 2, 1937, manager Schwartz informed Rapport that he believed the employees were going to attend a meeting of the Rubber Workers' Union that night. That afternoon during working hours the employees were assembled again and Rapport addressed them, counseling them against having anything to do with outsiders and urging them not to pay their dues to fellows to ride around in big cars and smoke cigars, but to keep their money and work out something among themselves, and he suggested a little inside organization and offered to contribute one thousand dollars to such organization and the proceeds of the candy vending machines, which produced a considerable revenue.

As the employees were leaving that afternoon, Rapport stood at the gate and urged them to go home and not to attend the union meeting. Outside the building an organizer of the union was distributing leaflets to the employees as they left the plant, and Rapport stood to block the doorway and told several of the employees to use a rear exit, theretofore forbidden to the employees. He referred to the organizers as racketeers and stated that before he would let the union get into the plant, he would close it down and move somewhere else.

Schwartz, the manager, who had the right to hire and fire men, inquired of the employees why it was necessary to have an outside union and suggested a company union. Manager Schwartz also requested

one of the employees to join the union and act as a stool pigeon for the company.

Subsequently to the meeting of April 2, 1937, the union sought to negotiate a contract with the company. During the negotiations, Rapport stated that he would not recognize the union under any circumstances if it were not for the fact that he had a lot of orders waiting to be shipped out. He stated the union had him by the neck and if he ever had the opportunity, he would get even with the union. Rapport called the leaders rats, disloyal rats, and stated that the time would come when he would get rid of the whole committee representing different departments of the plant.

On April 23, 1937, the company entered into a collective bargaining contract with the union as the sole collective bargaining agency for the employees in the production and maintenance departments. It will be observed that the acts of the company's officials above related had transpired prior to the date upon which the company entered into a collective bargaining agreement with the union, to wit, April 23, 1937. It is therefore contended by the company that these acts were not sufficient to show a violation of Sec. 8(1), because the company had subsequently entered into a collective bargaining agreement with the union.

Whatever force there may have been in this contention was lost by reason of the fact that the officials of the company, after they entered into the collective bargaining agreement, did not cease their opposition to the union but continued to manifest that same character of hostility that had so clearly characterized their attitude prior to entering into the collective bargaining contract. Their attitude towards the union had not changed in the slightest, and they felt that their act in entering into the contract with the union was under duress and they entered upon its performance with all the mental reservations of hostility to the union that they possessed before entering into the contract. It was the same pattern of hostility and opposition to the union after the contract as it was before, as made manifest by the following facts after the collective bargaining contract with the company was in force and bargaining became necessary.

In the numerous conferences with Rapport and Schwartz, they both renewed their threats that if the union persisted in its attitude they would remove the factory from the city and the men would be without work and the means whereby to earn bread for their families. In one instance when a shop committeeman, Moore, attempted to present what he conceived to be a grievance of the union, Rapport became incensed, berated, cursed and bemeaned employee Moore and threatened him with a crank handle, telling him he had no right to tell him (Rapport) how he was to run the factory, that he had no right to be a shop steward, that he was only a janitor, that was all he was and that was all he would ever be; that he went to college and got his head full of union ideas about organizing the union and that he (Rapport) would get rid of Moore and the union too.

After these contracts for collective bargaining had been entered into with the company, Rapport stated to the employees in the course of his conversations with them that the union had cost him fifty-odd thousand dollars and that outsiders had put ideas of unionism in the employees' heads, and that he and the union could not exist in the same place at the same time, and he stated that if the employees kept on giving him trouble, "one of us will have to go," that he had his investments and the employees could draw their own conclusions; that while he might concede certain things, he had to consider the stockholders and they might not be willing to compromise with the union; that the next time they had any trouble in the Blanket Department, it was going to be a different story; and that he was looking around for a site where he might install the Blanket Department, that the Blanket Department was giving him too much interference and that he could move the factory out of town.

The superintendent, Peters, said to the employees after entering into the contract: "throw away that (union) button. Mr. Rapport don't like that thing" and that, "The union is no good. Shame on you, you go for the union" and criticized the union as a "bunch of radicals and Bolsheviks."

Thus it will be seen that the pattern of opposition as clearly outlined by the hostility of the company's officials before the contract with the union was entered into continued after the contract had been entered into. The making of the contract did not purge the company of its acts of interference, et cetera, which acts, manifesting a like attitude, continued after the contract had been entered into.

We think that the evidence is ample to sustain the Board's findings on interference, restraint and coercion in violation of Sec. 8(1). National Labor Relations Board v. Link-Belt Company, 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368; Heinz Company v. National Labor Relations Board, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309; National Labor Relations Board v. Jahn & Ollier Engraving Company, 7 Cir., Nov. 26, 1941, 123 F.2d 589; National Labor Relations Board v. W. A. Jones Foundry and Machine Company, 7 Cir., Nov. 5, 1941, 123 F.2d 552; New York Handkerchief Mfg. Co. v. National Labor Relations Board, 7 Cir., 114 F.2d 144.

■ The making of the contract for collective bargaining did not absolve the company of its prior unfair labor practices when those practices were continued in substantially the same pattern after the contract had been entered into.

■ It is argued by the company that because the employees joined the union almost one hundred per cent, therefore the evidence of duress and the effectiveness of the duress had not been shown. In the first place, it is not necessary to show duress but only interference, and it is not necessary that the interference shall be successful in preventing organization. It is only necessary to show that the employer interfered, intimidated or coerced. It is the purpose of the statute to see that the employer does not interfere or intrude into the affairs of the employees.

The important question in this case revolves around the findings of the Board that the company refused to bargain collectively with the union and that by reason of this unfair labor practice a strike was precipitated on March 10, 1939.

■ As evidence to support the Board's finding that the company refused to bargain collectively with the union, these facts are established in the record by substantial evidence.

The Blanket Department required semi-skilled employees. It was generally considered by the employees throughout the plant that the Blanket Department was a desirable place to work. Transfers to this department from other departments in the plant were for one reason or another coveted by the employees. The Blanket Department was new and prosperous and seemed to have a promising future and to offer steady employment with overtime. To be transferred from other departments to the Blanket Department when a vacancy occurred therein was a matter of much concern to the employees, and they felt that it was a condition of employment about which they were entitled to receive consideration under the contract and negotiations with the company. The employees considered a transfer to the Blanket Department as a promotion.

In 1937 one Meskan was employed in the machine shop and was transferred to the Blanket Department as a spreader's helper. The union shop committeeman, Moore, conceived this to be a violation of the seniority provisions of the collective bargaining contract and suggested that the company should have promoted an employee already working in the Blanket Department who had seniority. Moore was mistaken about any seniority provisions being in the 1937 contract, which was about to expire. When Rapport was advised of Moore's alleged grievance, it was then that he armed himself with a crank handle and threatened and cursed Moore, as heretofore recited. The result was that Moore called a strike and for a very short time the men left their work. In the angry exchange between Moore and Rapport, Rapport ordered Moore discharged, but the company acceded to the union's demands, reinstated Moore and the incident was settled.

In the early part of May, 1938, the company and the union entered into another contract. This contract provided that "(10) promotions shall be made in accordance to seniority so far as practicable, consistent with efficient operation."

On September 6, 1938, the company transferred Ruby Levy from the laboratory to the Blanket Department without any consideration for the provisions of the contract with reference to seniority. The union committee protested the transfer to Schwartz and Rapport, claiming that it was in violation of the contract. Levy was not a production worker and was not a member of the union, while at that time there were several members of the union unemployed who had more seniority than Levy. Upon presentation of this grievance to Rapport, he admitted that it was contrary to the contract but asked that it be granted as a special favor to him because of his interest in Levy. At a special meeting of the union the following day the union refused to sanction the transfer of Levy and so advised the company. The

company did not remove Levy and the employees stopped work for two hours in protest of the transfer. Thereupon the company accepted the union's contentions, and Levy went back to the laboratory.

We have cited the instances of Meskan and Levy not as instances of refusal to bargain but to show the arbitrary attitude of the company in its dealings with the union. The contract for 1938 contained the following provision: "All applicants for employment shall be referred to the Shop Committee before going to work."

During the last week in February, 1939, and while the 1938 contract was in full force and effect, the company hired four new employees to work in the Blanket Department. The men commenced work on March 2. At no time before the men went to work did the company consult the shop committee with reference to their hiring, although they were introduced to the shop committee when they reported for work. As stated before, the union had always contended that transfer from some other department to the Blanket Department was a promotion. The union further contended that the employer should have, in accordance with the contract, referred the employees to the shop committee before they went to work instead of hiring them and then bringing them up to the plant to introduce them to the shop committeemen. The union position was that they wanted the right to be heard on any objections to the men that were to be placed and an opportunity to get them into the union. This they claimed they were denied when the company sent them the employees after they had been hired. The union did not claim the right to say who should be hired or to veto the decision of the management in that regard. They claimed they had a right to have the men referred to the shop committee before employed. The union presented its grievance to the plant manager, Schwartz, and claimed that in the hiring of these four men the company had violated paragraphs 1 and 10 of the contract. To this Schwartz replied: "Well, we don't think it is. I think you boys are wrong in coming down here at this time, management has seen fit to place these men, management has seen fit to keep them there." Rapport entered the room and the shop committee of the union informed him that it desired to discuss with him the question of seniority involved in the hiring of the four men. To this Rapport replied: "I

don't think there is anything to discuss, everybody is working, we hired some additional men, that is all there is." Rapport further stated there would be no "negotiations on interpretation of the contract, that it was a problem of management," and he stated further, "I don't need to put up with you fellows, if I don't want to. You caught me lying down before and you were prepared, and then I wasn't. * * * There is only you five fellows that is running this union. * * * Why, if you fellows went on strike, they wouldn't stick with you. * * * We are telling you all now and whether you like it or not these men are going to remain in the blanket department." Rapport also stated, referring to his prior dispute with the union concerning the Blanket Department: "I did not accept anything, you forced me to. You know I had to sign all those contracts and I had to accept your contentions then because I was not prepared and you was. This time it will be a different story."

On March 2 the union wrote to the United Rubber Workers of America at Akron, Ohio, requesting authorization to strike and in its letter stated:

"We feel that our contract was violated on three counts, first, when he hired the men without informing the Shop Committee, second when he disregarded our members chances for advancement through seniority and third when he absolutely refuses to discuss the matter further with our shop Committee."

On March 3, 1939, the union voted to go on strike. On March 6, 1939, at the request of the union, Rapport and his attorneys met with the shop committee and two representatives of the United Rubber Workers of America. This meeting lasted from five p.m. until nine or ten p.m. Rapport told the union representatives at this meeting that the hiring of the four men was a question of management and the union had no right to negotiate concerning the hiring of these men, and denied that the Blanket Department was a promotion over the other departments in the plant. The union proposed that the company compromise by retaining two of the new employees and promoting two members of the union. Rapport refused, saying: "We would like to manage the affairs of the progress of the company," and that, "Regardless of what you fellows do this plant will operate. We have men to take your jobs if you leave."

On March 10, 1939, the union went on strike. Before the strike but on the day of the strike two meetings were held between the shop committee and Rapport. The first meeting was in the morning when the committee informed Rapport that the Local had received authorization to strike and asked him to consider the matter in dispute. Rapport replied that it was a question of management and could not be negotiated and that there would not be any interpretation as far as the contract was concerned. The shop committee then asked Rapport if he would not transfer Levy to the Blanket Department, that this would end the controversy so far as they were concerned. Rapport said he would stand pat. At two-thirty o'clock in the afternoon the union went on strike, having agreed with Rapport that several of the members would remain on the job to prevent deterioration of materials in process. On March 13, 1939, the company began to hire new employees. On the same day the committee of the union and a representative of the Department of Labor met with the attorneys of the company and the attorneys stated: "We cannot negotiate the matter, * * * we told these boys before they went out on strike and we tell them now that it is a strict prerogative of management, the placing and the hiring of men."

■■ These facts seem to us clearly to support the Board's finding that the company refused to bargain collectively with the union. These facts clearly show a disposition on the part of the company not to negotiate or discuss with the union questions involving the conditions of employment and the interpretation of the contract under which the parties were working. Both of these things the union had a right to negotiate with the company. The company took the position that because the matters the union submitted to it for negotiation involved the interpretation of the contract that they were matters upon which they could not and would not negotiate.

In this we think the company was in error. The interpretation of the contract is a proper subject for negotiation. The Supreme Court said in National Labor Relations Board v. Sands Mfg. Co., 306 U.S. 332, 342, 59 S.Ct. 508, 514, 83 L.Ed. 682:

"But we assume that the Act imposes upon the employer the further obligation to meet and bargain with his employes' representatives respecting proposed changes of an existing contract and also to discuss with them its true interpretation, if there is any doubt as to its meaning."

■ We cannot say that the contract was free from doubt or that the union acted unreasonably in its contention as to the correct interpretation of the contract and its application to the men's working conditions. It wanted to negotiate about it. This the company refused to do.

The company did not bargain collectively but engaged in talk with representatives of the union when it had declared its purpose not to negotiate. An intransigent attitude is not neutralized by purposeless talk. It was the duty of the company to meet the representatives of the union not with a closed mind but with an open mind, with the purpose and intention in good faith to try by an exchange of views to reach an understanding and a conclusion if possible. Edmund Burke once said: "All government, indeed every human benefit and enjoyment, every virtue and every prudent act, is founded on compromise and barter." Faith in this democratic doctrine led Congress to pass the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. The requisites of bargaining thereunder were set forth plainly in National Labor Relations Board v. George P. Pilling & Son Co., 3 Cir., 119 F.2d 32, 37:

"Bargaining presupposes negotiations between parties carried on in good faith. The fair dealing which the service of good faith calls for must be exhibited by the parties in their approach and attitude to the negotiations as well as in their specific treatment of the particular subjects or items for negotiation. For such purpose, there must be common willingness among the parties to discuss freely and fully their respective claims and demands and, when these are opposed, to justify them on reason. When the proffered support fails to persuade or if, for any cause, resistance to the claim remains, it is then that compromise comes into play. But, agreement by way of compromise cannot be expected unless the one rejecting a claim or demand is willing to make counter-suggestion or proposal. And, where that is expressly invited but is refused, in such circumstances the refusal may go to support a want of good faith and, hence, a refusal to bargain."

The company obviously did not meet this standard. The company would not compromise. It would not barter. It "stood

pat." That most certainly is not bargaining. It was opposed to the union from the start. It never changed, but waited until it thought it was strong enough to defy the union. When it reached that point its attitude was defiant and stubborn. Its mind was closed. Good faith in bargaining in the spirit of tolerance for the purpose of compromise and barter gave way to intransigeance. The company's president went forth armed with a crank handle instead of a disposition to bargain fairly. This court in National Labor Relations Board v. Boss Mfg. Co., 7 Cir., 118 F.2d 187, 189, said:

"Collective bargaining requires that the parties involved deal with each other with an open and fair mind and sincerely endeavor to overcome obstacles or difficulties existing between the employer and the employees to the end that employment relations may be stabilized and obstruction to the free flow of commerce prevented. National Labor Relations Board v. Sands Mfg. Co., 306 U.S. 332, 342, 59 S.Ct. 508, 83 L.Ed. 682; Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 236, 59 S.Ct. 206, 83 L.Ed. 126; H. J. Heinz Co. v. National Labor Relations Board [311 U.S. 514], 61 S.Ct. 320, 85 L. Ed. 309, decided by the Supreme Court January 6, 1941; National Labor Relations Board v. Somerset Shoe Co., 1 Cir., 111 F. 2d 681, 688; Globe Cotton Mills v. National Labor Relations Board, 5 Cir., 103 F.2d 91, 94; and National Labor Relations Board v. Sunshine Mining Co., 9 Cir., 110 F.2d 780, 787. Mere pretended bargaining will not suffice, National Labor Relations Board v. Whittier Mills Co., 5 Cir., 111 F.2d 474, 478, neither must the mind be hermetically sealed against the thought of entering into an agreement, Somerset Shoe case, supra, 111 F.2d 688. To do less than is required by the decisions above cited is a refusal to bargain collectively and violates the spirit and tenor of the Act."

The evidence supports the conclusion that the company, with a hostile attitude from the beginning, dealt reluctantly with the union and bided its time until it felt itself able to defy the union. This it did in its refusal to bargain collectively. That was a challenge to the union to strike, that the company was ready. The union struck because, as the Board found, of the unfair labor practice of refusing to bargain collectively. There is substantial evidence to support the Board's findings. National Labor Relations Board v. Sands Mfg. Co., 306 U.S. 332, 342, 59 S.Ct. 508, 83 L. Ed. 682; National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L. Ed. 368; M. H. Ritzwoller Co. v. National Labor Relations Board, 7 Cir., 114 F.2d 432; Singer Mfg. Co. v. National Labor Relations Board, 7 Cir., 119 F.2d 131; National Labor Relations Board v. Boss Mfg. Co., 7 Cir., 118 F.2d 187. This unfair labor practice the Board found was the cause of the strike of March 10, 1939. In this we think the Board was justified.

On May 9, 1939, the striking employees, eighty-four in number, offered to the company to return to their employment. The company, believing it had not committed any unfair labor practice, refused the employees' offer and claimed the right to employ others to take the place of the strikers, as it might see fit. This constituted discrimination in the hiring and tenure of the striking employees. When the employees went out on a strike because of the unfair labor practice of the company, their status as employees for the purpose of any controversy growing out of that unfair labor practice was fixed. Sec. 2(3) of the Act. Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L. R. 1217.

For the purpose of such controversy they remained employees of the company. The company contended that they could not be their employees in any event since the contract of their employment expired by its own terms on April 23, 1939.

In this we think the company is mistaken for the reason we have just pointed out, that the status of the employees on strike became fixed under Sec. 2(3) of the Act because of the unfair labor practice of the company which caused the strike.

We have further to consider the discrimination the Board found with regard to employees Schnitzer and Levy. On March 14, 1939 Schnitzer was discharged and on March 24, 1939, Levy was discharged. The company claimed they were discharged because they refused to perform duties or work assigned to them by the company.

Schnitzer was employed as an assistant in the laboratory. Immediately after the strike the company began to transfer laboratory employees to the factory to

work as strikebreakers. On March 13, 1939, the Monday following the strike, Rapport asked Schnitzer if it was against his principles to work in the factory. Schnitzer replied that it was during the strike. A few minutes later Rapport told Schnitzer not to do any more work in the laboratory unless he was instructed to do so. No more work was assigned to him until March 17, when he was instructed to teach one Fox to do his work, which he did. Later on in the same day, manager Schwartz told Schnitzer that the company was not busy and would not need Schnitzer any more, and they would call him back when they got busy again. Towards the end of March Schnitzer joined the picket line of striking employees, and the plant foreman said concerning him that the other men might come back to work but that Schnitzer never would do so. The company never reemployed Schnitzer thereafter although it did employ three laboratory assistants after Schnitzer's discharge. He was not a member of the union.

On March 11, the day after the strike, Levy refused to act as a strikebreaker. On March 13 Rapport said to Levy: "Ruby, I hear it is against your principles to work in the factory," to which Levy replied: "Yes, that's correct. I am sorry." Shortly thereafter Rapport instructed Levy not to do any more work until Schwartz assigned him more. On March 16 the company employed one Dobkin as a research chemist and Levy showed him some of the processes in the laboratory. On March 24 Levy was given his pay check and told by manager Schwartz: "I am sorry, Ruby, but there is not much work to do around here, as you can see for yourself, and we will have to leave you go." Levy was never called back to work. He was not a member of the union. He did not want to be reinstated as he had entered college.

We think it is a fair inference that these two employees were discharged because of their refusal to act as strikebreakers. Soon after their refusal, they were ordered to do no more work until some was assigned to them. No work was assigned to Schnitzer except to show Fox what work he had been doing. Levy remained a short time longer than Schnitzer and after he had shown his work to Dobkin, Levy was discharged. Both were told that they were discharged because work was slack. The evidence supports the charge that Schnitzer and Levy were discriminated against in their tenure because of their sympathy for the union.

The company by its unfair labor practice had caused the strike. The employees by reason of the wrongful act of the company had not lost their status as employees. Therefore, when they offered to return to work in a body within two months of the date of the commencement of the strike they were entitled to reinstatement to their old positions then held by persons employed to take their place after the strike. When the company refused to take back its striking employees and insisted on keeping in positions persons hired after the strike, it discriminated against the old employees in violation of Sec. 8(3) of the Act. National Labor Relations Board v. Mackay Radio & Telegraph Co., 304 U.S. 333, 346, 347, 58 S.Ct. 904, 82 L.Ed. 1381; M. H. Ritzwoller Co. v. National Labor Relations Board, 7 Cir., 114 F.2d 432, 437; Black Diamond S. S. Corp. v. National Labor Relations Board, 94 F.2d 875, 879.

 We now consider the propriety of the Board's order. The cease and desist provisions of the order are usual and proper. National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U. S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L. R. 307; National Labor Relations Board v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930.

 The provisions for back pay are authorized by the statute and are usual in such cases. No point is made against this provision except the company attempts to raise for the first time a question concerning the measure of back pay to be received by the employees, urging consideration of the rule laid down in the case of Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 61 S.Ct. 845, 855, 85 L.Ed. 1271, 133 A.L.R. 1217, concerning "unjustifiable refusal to take desirable new employment."

No evidence on this question was offered or heard in the proceedings below, nor was the point urged or presented to the Board. The company, in reliance upon the rule in the Phelps Dodge case, for the first time in this court, suggests that no consideration was given to "unjustifiable refusal to take desirable new employment" and asks us "to decide the question underlying the liability for back pay without requiring an intermediate remandment of the case to the Board."

In the Phelps Dodge case, the Circuit Court of Appeals did just that and the Supreme Court held:

"But though the employer should be allowed to go to proof on this issue, the Board's order should not have been modified by the court below. The matter should have been left to the Board for determination by it prior to formulating its order and should not be left for possible final settlement in contempt proceedings."

Thus we see it was a matter for consideration of the Board. It was never presented to the Board in the case at bar. The Board was never given a chance to pass upon it. Furthermore, there has not been a showing made that such facts exist as would warrant the presentation of this issue to the Board. If there are such facts, let a showing as to their existence be presented to the Board, with a motion to modify the order to permit the presentation, and such further modification as the evidence may warrant in that regard.

In the light of what the Supreme Court has said, we do not think it is within our province to settle the question underlying the liability for back pay.

The order of the Board is approved as written, but the cause is remanded to the Board to permit the company upon the showing of the existence of evidence as to unjustifiable refusal to take desirable new employment upon the part of the discharged and the striking employees, to present a motion to the Board for modification of its order for the presentation of such evidence, if any, and for such further modification of the Board's order as may be warranted by the evidence introduced relating to this one issue.