## NATIONAL LABOR RELATIONS BOARD v. AINTREE CORPORATION.

No. 8028.

Circuit Court of Appeals, Seventh Circuit.
Nov. 12, 1942.

Rehearing Denied Dec. 4, 1942.

Robert B. Watts, General Counsel, Ernest A. Gross, Associate General Counsel, Gerhard P. Van Arkel, Asst. General Counsel, Owsley Vose and Millard L. Midonick, Attorneys, National Labor Relations Board, all of Washington, D. C., for petitioner.

Kelley A. Loy and Burgess, Loy & Burgess, all of Fairfield, Ill., for intervenor.

Hyman G. Stein, of St. Louis, Mo., for respondent.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

Respondent is engaged in the manufacture, sale and distribution of men's underwear and pajamas at its plant in Fairfield, Illinois. Upon charges filed by the International Ladies' Garment Workers' Union, affiliated with the American Federation of Labor, the National Labor Relations Board issued its complaint against the respondent alleging that it had engaged in unfair labor practices within the meaning of § 8(1), (2), and (3) of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.

In substance the amended complaint alleged (a) that the respondent, by its officers, agents, and employees, urged and warned its employees to refrain from aiding, becoming, or remaining members of the International Ladies' Garment Workers' Union, interrogated its employees concerning their union membership and activities, made statements to its employees implying that they would not be benefited by joining the Union, and threatened to move its plant should its employees join the Union; (b) that the respondent dominated and interfered with the formation and administration of a labor organization of its employees known as "The Better Union"; and (c) that the respondent discharged and has refused to re-employ one Mina Hale because of her activities on behalf of the International Union.

The Board found that the respondent, by interfering with, restraining, and coercing its employees in the exercise of the rights guaranteed them by § 7 of the National Labor Relations Act, 29 U.S.C.A. § 157, had engaged in unfair labor practices, had dominated and interfered with the formation and administration of The Better Union, and had discriminatorily discharged an employee in violation of § 8(1), (2), and (3) of the Act, 29 U.S.C.A. § 158. Upon these findings the Board ordered respondent to cease and desist from the unfair labor practices, directed respondent to reinstate with back pay the employee against whom it had discriminated, and to refrain from recognizing The Better Union.

No jurisdictional issue is involved. The question we are asked to determine is whether the findings are sustained by substantial evidence.

The evidence discloses that prior to September, 1940, no labor organization existed at the plant. About September 15, 1940, an organizer for the American Federation of Labor undertook the organization of respondent's employees. He succeeded in enrolling a number of the employees, and on November 7, they elected officers. After publicity had been given to the election of the officers of the International, Jesse R. Baker, respondent's production manager,

approached Arline Potts, one of respondent's employees and secretary of the International, and handed her a copy of the bulletin naming the union officers and informed her that the president of the International was a rotten operator and would be discharged if she did not improve; that personally he was not for the union; that all they wanted was dues; that they would not stand behind her, and as proof pointed to the case of a machinist who had been let down by a union while working at a garment factory at a nearby town.

During the latter part of September, Baker approached Goldie Manlove, a production employee, while she was at work at her machine and inquired whether any of the union organizers had been around to see her. When informed that they had not, Baker told her they had had a union organizer "up before the Judge last night and they threatened to run him out of town"; that he didn't see why the girls wanted a union, that all the union wanted was their dues each week, and that they would be no help to the girls whatever, adding, "all the union wanted was dues to buy big cars for big shots of the union to ride around in, and they were nothing but a bunch of racketeers."

On December 19, a group of respondent's employees, including foreman Perry Musgrave and employee Clem Anthis, held a meeting to discuss ways and means of stopping the International. One of the witnesses testified, "we wanted to keep that one [International] out and we would rather have one of our own and keep our money here at home." Another testified, "they would rather have this other union than the International Ladies Garment Workers Union." December 26, Anthis arranged for the use of the City Hall for a meeting on December 27 and made an appointment with Attorney Brown. On the morning of December 27, after Anthis had secured permission from foreman Musgrave to leave the plant, he conferred with Brown, and it was decided that the formation of a rival organization was the most effective means of halting the International.

About 100 of respondent's employees, including foremen Musgrave and Humphrey and foreladies Shehorn and Schumacher, attended the meeting held at the City Hall. Anthis opened the meeting and introduced Brown, who explained that Anthis had asked him if there was anything they could do to stop the International. Brown suggested that a union of their own would serve the purpose.

On January 3, 1941, The Better Union, claiming a majority of respondent's employees, made a written demand that it be recognized as the collective bargaining representative.

On December 27, before The Better Union was organized, Baker met several members of the International and said: "Listen, girls, I am not going to talk about the union tonight. I want you to know there is not a law in the land to keep this factory from moving out of town * * *. Look at the Flora plant that moved out of Flora on account of union activities and they never did move back * * * if we did have a union in this plant it could move, but it wouldn't be through union activities."

On January 2, 1941, a local newspaper published an article describing The Better Union meetings. The article was headed "Combating Union at Campe [Aintree] Factory Here. More Than 100 Employees 'Organize' to Defeat Union Organization; Fear Factory Will Move." The article explained the formation of T. B. U. as follows: "Knowing the history of the Aintree plant that they will not operate where unions are organized and observing obvious moves of the plant toward the closing of the factory here, the employees decided to meet and see what, if anything, could be done to stop the move of the union organizers—thus protecting their jobs."

T. D. Leary, respondent's general manager, sent copies of this article to Irving Flamberg, respondent's president, in New York, who after a few days prepared a notice for posting on the plant's bulletin board and sent copies thereof to the local newspapers, together with letters denying that respondent had made threats with regard to the future employment of Fairfield workers. Flamberg spoke to the entire supervisory staff and instructed them that he did not want them interfering and specifically that he did not want them to enter into any discussions in the plant concerning organization.

Notwithstanding Flamberg's instructions to the foremen and foreladies to refrain from interfering with the employees, the foremen and foreladies continued to attend meetings of The Better Union down to

and including meetings in 1941. Respondent's view was, as Leary testified, that what the foremen and foreladies did outside of the plant was none of his business; that it was only in their department that Flamberg's instructions were applicable.

Shortly after the meeting of December 19, Anthis, whose duties kept him in the cutting room most of the time, began to stay away from the cutting room. He frequently would leave the building altogether on occasions for as long as an hour, his visit to the office of Attorney Brown taking one hour and a half. During this period Anthis also visited Leary's office with a frequency that had not been observed previously, and he was frequently seen sitting chatting with Leary.

The point is made that respondent should not be held accountable for the activities of its supervisory employees. The Board found that Baker was acting on behalf of the respondent in opposing International. The general manager of the plant testified that Baker's duties were to assist him in getting out the orders and regulating the plant; that Baker had authority to make recommendations as to who should be hired and discharged; and that these suggestions were followed by the general manager. The Board also found that foremen Musgrave and Humphrey and foreladies Shehorn and Schumacher were supervisory employees; that they gave their support to The Better Union; and that respondent was responsible for their actions. The Board found further that the presence of these employees at the organizational meeting of The Better Union—announced as a meeting to keep the International out—showed the employees that their immediate superiors, at least, approved the action taken at the meeting, and that their attendance at later meetings continued to throw the respondent's support to The Better Union.

■ We have already been told that foremen may be management representatives and their acts attributable to the employer, and that actual employer authority is not of controlling importance, Heinz Co. v. Labor Board, 311 U.S. 514, 520, 61 S.Ct. 320, 85 L.Ed. 309. Nor are ineligibility to union membership and the power to hire and discharge conditions precedent to employer responsibility for the acts of the supervisory employees, International Ass'n of Machinists v. Labor Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50.

■ There was testimony that the supervisory employees were in complete charge of their departments and directed the employees at work, and that Baker's recommendations as to who should be hired and discharged were followed by the general manager. Under these facts, it is plain that respondent should be held accountable for the activities of these supervisory employees.

The main question here is whether the Board was justified in its conclusions that the respondent's conduct toward the International amounted to interference with its employees in the exercise of their rights under § 7 and whether the respondent dominated and interfered with the formation of The Better Union.

Counsel for the respondent and The Better Union contend that the statements of Baker were no more than an expression of opinion in the course of friendly and casual conversation and may not be held coercive or to have interfered with or restrained the employees in their free choice.

■ We are obliged to state again as we have so frequently said in this class of cases, that the Act vests in the Board, and not in the courts of review, the duty of appraising conflicting evidence, drawing inferences from established facts and circumstances, and resolving issues of fact. Our function is limited to determining whether there was substantial evidence to support the Board's findings of fact. If there was, these findings cannot be disturbed on review.

■■ From this record, there can be no question but that the employees had just cause to believe that the respondent disapproved of an outside union, and while it is true that it was not necessary that the Board show that normally coercive conduct had its intended or desired effect, Labor Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368, and Rapid Roller Co. v. National Labor Relations Board, 7 Cir., 126 F.2d 452, 457, here it is clear that the words and deeds of the supervisory employees, for which we have already held respondent responsible, taken in their setting, were reasonably likely to have restrained the employees' choice. Consequently, they are a proper basis for the conclusion that the respondent had interfered with its employees in the exercise of their rights and that it had dominated and interfered with the formation of The

Better Union. See Link-Belt case, supra, 311 U.S. 599, 61 S.Ct. 358, 85 L.Ed. 368.

■ We have considered the testimony concerning the discharge of Mina Hale because of her activities on behalf of the International, and after such consideration, conclude that her discharge because of these activities on behalf of the International is supported by substantial evidence.

■ Finally, respondent questions the legality of the order that it cease and desist from in any manner interfering with its employees in the exercise of their right to self-organization. We think, under the facts here appearing, the general injunctive order is proper. Labor Board v. Express Pub. Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930; National Labor Relations Board v. Reynolds Wire Co., 7 Cir., 121 F. 2d 627; and Rapid Roller Co., supra, 126 F.2d 461.

The Board's request for enforcement of its order is granted.

MAJOR, Circuit Judge (dissenting).

I am aware of the futility of taking issue with the Labor Board, but my study of the record leaves no alternative. Notwithstanding the fact that we are bound by findings of the Board, if substantially supported, I am unable to reconcile myself to the theory that we are merely a "rubber stamp." If so, the "right of review" is without potency and becomes an idle and useless ceremony.

The unfavorable background, so heavily stressed by the Supreme Court in cases such as International Association of Machinists, Tool and Die Makers v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50, and National Labor Relations Board v. Link-Belt Company, 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368, places the instant case in a different category. This background, however, has been completely ignored by the Board. There is not a scintilla of evidence of any anti-union history,—that respondent has ever fostered company unions, broken strikes, been guilty of espionage or of any character of hostility against or favoritism toward any union or member thereof. When this background is considered, the few picked and garbled statements relied upon by the Board are insignificant. As said by the Supreme Court in the Link-Belt case, on page 599 of 311 U.S., on page 366 of 61 S.Ct., 85 L.Ed. 368: "If the words or deeds of the supervisory employees, taken in their setting, were reasonably likely to have restrained the employees' choice and if the employer may fairly be said to have been responsible for them, they are a proper basis for the conclusion that the employer did interfere."

In the instant case, the record discloses conclusively, in my judgment, that the statements relied upon did not restrain the employees, and, furthermore, that the management was not responsible for such statements.

Most of the statements relied upon are chargeable to Baker, who was respondent's production manager. In July of 1940, one Leary was installed as respondent's plant manager. At that time, respondent was in a precarious condition financially. Leary called a meeting of the employees and informed them that production would have to be increased or the company would be compelled to close its plant. He told them that he was in sole charge and that no one other than he would have authority to hire, fire or lay off employees, and that all orders would be issued by him. It was subsequent to this that an organizer appeared on the scene, for the purpose of organizing the International.

The two main witnesses relied upon by the Board to show restraint or coercion are Potts and Manlove. The former testified that she "certainly" understood that Baker was merely expressing his own opinion and not the view of the company. Potts, who was an officer of the International, continued as such and was actually promoted to a better paying position. Manlove also testified that she understood Baker was merely expressing his own opinion. She became a member of the International, and shortly afterwards was also promoted to a better paying position. Neither Potts nor Manlove reported the statements relied upon to any of their fellow employees, to the International organizer or to the management. There is not the slightest ground for the inference that these two employees were coerced or interfered with, and certainly statements made to them and unreported could not have influenced any other employee.

The statement attributed to Baker on the night of December 27, and the circumstances surrounding the same, are stressed. On that evening four members of the International were stationed in an automobile which was parked in front of the City Hall

where The Better Union was holding its meeting. Baker was passing by on the sidewalk and was called over to the car, and the occupants commenced a conversation with him. They asked him if he was going to the meeting and if he would take them with him. According to their own version, he chatted with them for half an hour in casual conversation. Baker told them that he did not want to engage in conversation concerning the union. The Board's testimony disclosed that the whole conversation was initiated by the occupants of the car, and that Baker was merely answering their questions. It was in response to such questions that Baker said the factory could move out of town but it wouldn't be because of union activities. This incident is illustrative of the friendly and sociable relation which existed between Baker and the employees. Whether on the street or in the factory, he chatted and visited with the employees in a most friendly and informal fashion.

If, however, any unfavorable inference could be drawn from Baker's statements of December 27 standing alone, such inference was totally dispelled by an occurrence of December 10. On this occasion, Flamberg, respondent's president, who resided in New York City, and Leary met in conference with Ellinger, the International organizer, and with the officers of the International local. It is not claimed that International, at that time or any other, represented a majority of respondent's employees. In that conference, Flamberg told the officials of the International local that respondent would recognize and bargain with their union if it was selected by a majority of the employees, that he had no choice in the matter at all, and "that he was not fighting unions." According to the Board's witnesses, Flamberg made it plain that no discrimination would be tolerated against any employees on account of union membership, and requested them to report to Leary anything which they might feel was a discrimination against any member of the union. At the request of International's organizer, Flamberg authorized the union to quote him as to respondent's position in this respect. As a result, circulars were published and distributed by International officials to all of respondent's employees. The statement advised the employees, among other things, as follows: "Mr. Irving Flamberg, with permission to publish, declared he was willing to deal with the Union whenever a majority was reached and pledged that no worker would be discriminated against for union membership."

Thus, when the statements made by Baker are considered in connection with respondent's background, the unequivocal testimony of the persons to whom the statements were made that they knew such statements merely represented Baker's opinion and in further connection with respondent's attitude as expressed by Flamberg, made known to all of respondent's employees, there is not the slightest basis for a finding that such statements were coercive, or that they represented respondent's attitude. As was said in National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 479, 62 S.Ct. 344, 349, 86 L.Ed. 348: "It is clear that the Board specifically found that those utterances were unfair labor practices, and it does not appear that the Board raised them to the stature of coercion by reliance on the surrounding circumstances. If the utterances are thus to be separated from their background, we find it difficult to sustain a finding of coercion with respect to them alone."

The Board's decision dwells at length upon an article published in the Wayne County Press of Fairfield, January 2, 1941, entitled "Combating Union at Campe Factory Here." After elaborating the details of this article, this statement appears in a footnote: "We do not find that responsibility for the publication of this newspaper article referred to above is chargeable to respondent." It is plain that respondent had nothing to do with the publication of the article, and in fact repudiated it at the first opportunity. The question naturally arises as to why such admittedly incompetent evidence was offered, much less relied upon by the Board in its decision and in its brief in this Court.

The Better Union, an unaffiliated organization, was permitted to intervene before the Labor Board and also in this Court. In its brief, it is stated: "The primary purpose of the charges and the complaint was to destroy an independent union formed by a large majority of the workers, known as The Better Union." In my judgment, this assertion is justified by the record. There is not a scintilla of evidence that respondent in any way, shape or form assisted this Union, financially or otherwise. The circumstances relied upon by the Board are frivolous and so speculative as to carry little, if any, weight.

The Better Union had its inception at a Christmas party, held at the home of one of the employees on December 19, 1940. During such party, a discussion was had concerning the International. Most of those present were opposed, largely on account of the threats made by the International organizer. At any rate, one of those present, by the name of Anthis, was instructed to consult an attorney, which was done. The attorney prepared the constitution and by-laws and appeared at a meeting of those desiring to join The Better Union. The attorney explained their rights under the Act and that they were free to join either the International or The Better Union. The only asserted connection between the organization of The Better Union and respondent is furnished by the testimony of one Kittel, secretary of the International. According to his testimony, Anthis was frequently seen in Leary's office under friendly, and what Kittel thought were suspicious, circumstances. On his testimony, the Board found that "Anthis was accorded unusual freedom by the respondent during the period of time in which he was actively engaged in organizing T. B. U." There is no proof as to what was said either by Leary or Anthis, or that the visits had anything to do with the organization of The Better Union. Upon the Board's finding of "unusual freedom", it jumps to the far-fetched conclusion that it had to do with the formation of The Better Union.

The Board in its brief states that certain employees, including "Perry Musgrave, foreman of respondent's cutting room, discussed ways and means of stopping the Union." This was supposed to have happened at the party on December 19 heretofore mentioned. It is true that Musgrave was present at this party, but I am unable to find a word of testimony that he participated in the discussion. The fact is that one of the Board's own witnesses testified that he was not in the room when such discussion took place.

Another circumstance relied upon is that some of the supervisory employees attended meetings of The Better Union. It should be noted that they also attended meetings of the International. The fact further is they were invited to attend the meetings of both Unions, and at both they heard speakers fairly advise those present of their rights, and that they must choose for themselves which Union they preferred. These supervisory employees took no part in the discussion at the meetings they attended, either of The Better Union or of the International. The Board concedes in its brief, as it must, that the supervisory employees had a right to attend the union meetings and to join if they desired, but it is claimed that their presence at the meetings of The Better Union had a prejudicial effect. How this speculative conjecture was reached is not disclosed. There is no dispute but that such supervisors had been warned to be neutral as between the two Unions, and there is no proof that they rendered any form of assistance to either. Moreover, what was respondent to do? If it had discharged such supervisory employees for attending or joining either of these Unions, it no doubt would have been charged with discrimination. Such was the predicament of the employer in National Labor Relations Board v. Luxuray, Inc., 2 Cir., 123 F.2d 106, 108.

On January 3, 1941, The Better Union, through its attorney, made formal demand to be recognized as the bargaining agent for respondent's employees. At that time, it had a membership of 180, out of a total of about 250 employees. At the hearing before the Trial Examiner, it was stipulated that 180 employees would testify, if called, that they were members of The Better Union.

Thus the record, to me, conclusively demonstrates that there was no domination or interference with the organization of The Better Union. It was the free and voluntary act of the employees themselves. It was the exercise of a right guaranteed by the Act. For the protection of this right, 180 of such employees knocked at the door of the Labor Board in vain. To hold, as has been done under the flimsy pretexts advanced, that they were intimidated or coerced, is to disparage their intelligence. It is such decisions as this which are calculated to bring the National Labor Relations Act into disrepute. As a final climax to this arbitrary decree, respondent, among other things, is directed to post notices immediately, "that the respondent's employees are free to become or remain members of International Ladies' Garment Workers' Union, Local No. 373, affiliated with the American Federation of Labor, and that the respondent will not discriminate against any employee because of membership or activity in that organization."

I think the Board's petition for enforcement should be denied.