**NATIONAL LABOR RELATIONS BOARD v. JOHN ENGELHORN & SONS.**
**No. 8181.**

Circuit Court of Appeals, Third Circuit.

Argued Jan. 6, 1943.

Decided March 1, 1943.

554

Howard Lichtenstein, of Washington, D.C. (Robert B. Watts, General Counsel, Ernest A. Gross, Associate General Counsel, and Robert Todd McKinlay and Armin Uhler, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

William Karlin, of New York City, for intervenor Butchers Union.

Harry Silverstein, Millburn, N. J., for respondent.

Before MARIS, JONES and GOODRICH, Circuit Judges.

GOODRICH, Circuit Judge.

This case is before the Court upon petition of the National Labor Relations Board for enforcement of its order against John Engelhorn & Sons, a New Jersey corporation engaged in processing, slaughtering, packing, sale, and distribution of hogs, and related products. The chronological sequence of significant events prior to the order is as follows:

On January 27, 1938, Local 422 of the Amalgamated Meat Cutters and Butcher

Workmen of North America, an affiliate of the American Federation of Labor, filed a petition under § 9(c) of the National Labor Relations Act[1] for the investigation and certification of representatives at the Engelhorn plant in Newark. Thereafter the employer and the union agreed to a consent election which the union won. On July 8, 1938, they executed a written contract designating Local 422 the exclusive bargaining representative. The agreement was to remain in force until November 1, 1938, and to be automatically renewed from year to year thereafter unless either party gave thirty days' notice of intention to terminate. Such a notice was not given. The contract did not contain a closed shop clause.

In April, 1941, the C.I.O. began to organize Engelhorn's employees. On May 8, 1941, the C.I.O. notified the employer that it represented a majority of the employees and requested a bargaining conference. This request was refused on the grounds that the 1938 contract was still in effect. By a letter dated May 13, 1941, the employer was notified by the Regional Director for the Board that the C.I.O. had filed a petition for investigation and certification of representatives. On May 19, 1941, thirty-two of approximately forty-eight employees went on strike at the Engelhorn plant. To keep the plant in operation Local 174, to which jurisdiction had been transferred by Amalgamated,[2] furnished about ten employees. On May 27, 1941, the Local, although it had knowledge of C.I.O.'s petition to the Board, negotiated a new contract with the employer and the striking employees returned to work the following day. This contract designated Local 174 as the exclusive bargaining representative of all employees in a designated unit and contained the same renewal provision as the 1938 contract. It also provided for a closed shop. It was signed by the Local and the employer on May 29, and unanimously ratified by the employees involved at a meeting held on June 6, 1941.

Three days later the C.I.O.'s petition for investigation and certification of representatives was granted by the Regional Director. The C.I.O., Local 174 and the employer appeared, were represented and participated in the hearings which followed. At the conclusion of the latter an election in the unit found appropriate was ordered. The C.I.O. won the election and was certified by the Board as the exclusive bargaining representative on September 19, 1941.

The employer refused to bargain with the C.I.O. and upon charges filed by the union the Board issued a complaint dated February 17, 1942. It alleged that the employer had engaged in and was engaging in unfair labor practices affecting commerce within the meaning of § 8(1), (3), (5) and § 2(6) and (7) of the National Labor Relations Act. Local 174 and the employer filed separate answers to the charges and appeared and participated in the hearing. The Board sustained the complaint. It ordered the employer to cease and desist from the unfair labor practices found and from giving effect to its contract with Local 174. It further ordered the employer to bargain with the C.I.O. and to offer reinstatement with back pay to four employees and to post appropriate notices. This petition by the Board is for enforcement of its order against the employer. Local 174 is an intervenor in this action.

The employer has stipulated that it is engaged in commerce within the meaning of § 2 of the Act and will not contest the Board's jurisdiction. Nor is there any dispute as to the bargaining unit found appropriate by the Board. This unit coincides with the one agreed upon by Local 174 and the employer in the May, 1941, contract. The controversy thus is narrowed to issues growing out of the contract of May 29, 1941.

### The Closed Shop Agreement

The employer's defense to the proceedings both before the Board and this Court is the closed shop agreement of May 29, 1941. This agreement, it is said, makes legally ineffective as to the employer the election held by the Board and the certification of the C.I.O. The agreement thus being operative, everything done by the employer was sanctioned by it. To this defense, two lines of attack are made.

The first is that the employer may not raise for his protection in this proceeding a closed shop contract made with Local 174 at a time when the employer knew that

---

[1] 49 Stat. 449 (1935), 29 U.S.C.A. § 151 et seq.

[2] Local 422 and Local 174 had jurisdiction over that same industry, although originally they were confined respectively to Newark and vicinity and New York and vicinity. In the beginning of May, 1941, Local 174's jurisdiction was extended to cover the state of New Jersey.

an investigation and certification proceeding, instituted by a rival labor organization claiming a majority of the employees, was pending. The Board in accordance with its previous decisions,[3] so held. This proposition of law does not seem to have been squarely decided by any court decision.[4] Nor need we decide it here, for we consider the second line of attack sufficient. We think, as did the Board, that the agreement was invalid in view of the employer's activities attending its execution.

The proviso to § 8(3) of the Act provides that nothing in the Act or other legislation shall preclude an employer from entering into a closed shop agreement with a labor organization, subject, however, to several important qualifications. The labor organization must be the representative of the employees as provided in § 9(a) which requires its designation as bargaining agent by a majority of the employees involved. Furthermore, the labor organization must be one "(not established, maintained, or assisted by any action defined in this Act [sections 151–166 of this title] as an unfair labor practice) * *。 *." Neither of these conditions were met.

There is ample evidence to support the Board's conclusion that the agreement in question was made with a labor organization assisted by unfair labor practices. There was direct testimony on this point. Alex Borys, an employee, testified at the hearing that on or about May 23, 1941, he was approached by his foreman, Steve Kijak, who had authority to hire and discharge employees under his supervision, and warned that he and his fellow employees faced a plant shut-down and loss of their jobs unless they joined Local 174. Borys was given membership applications and told to sign up other employees. Kijak pointed out to him that, under the law, he himself

could not engage in such activities. Borys took the applications to the president of the company who admitted knowledge of what they were for and told him to "Go ahead." This Borys did and succeeded in obtaining the signatures of six or seven employees. This testimony was believed by the Board, whose function it is to determine the credibility of witnesses.

These facts support the Board's finding that the employer, in violation of § 8(1), interfered with, restrained and coerced its employees in the exercise of the rights guaranteed them by § 7 of the Act, 29 U.S.C.A. § 157. The employer contends that although this may be evidence, it is not "substantial evidence". We think it is. Borys' testimony was not weakened upon cross-examination; nor was it contradicted by any evidence offered by the employer or Local 174. It clearly establishes employer assistance to Local 174 by means of unfair labor practices. Moreover, the quick execution of the closed shop agreement, at a time when the employer knew of claims by another labor organization that it represented a majority of the employees, is itself evidential of assistance to the contracting union.[5]

It is further argued that no causal connection was shown between the unfair labor practices and their effect upon the employees. Borys' testimony, we think, showed that the employer's activity did have its desired effect on at least six or seven employees, a weighty number where the division of desires is only sixteen to fourteen, as proved by the results of the subsequent election. True, the employer's unfair labor practices may not have affected all or even a majority of the employees so as to be a direct cause of their affiliating with Local 174.[6] However, under the Act that is of no consequence. All that need be

3 See, for example: Theo. F. Anderson, 1942, 40 N.L.R.B. 853, 854; Sterling Engine Company, 1942, 41 N.L.R.B. 191, 192; Vermont Marble Company, 1942, 42 N.L.R.B. 185, 187; Wolfsheim & Sachs, Inc., 1942, 42 N.L.R.B. 232 (rival union had only a "substantial number" of employees); Delco Radio Division of General Motors Corporation, 1942, 42 N. L.R.B. 508, 510.

4 Cf. Consolidated Edison Co. v. National Labor Relations Board, 1938, 305 U.S. 197, 237, 238, 59 S.Ct. 206, 83 L.Ed. 126.

5 See International Association of Machinists; Tool and Die Makers Lodge No.

35, etc., v. National Labor Relations Board, 1940, 311 U.S. 72, 78, 79, 61 S.Ct. 83, 85 L.Ed. 50.

6 The Board thought it did. It found that during the strike and preceding the signing of the agreement, a rumor circulated among the employees that they faced loss of their jobs by a plant shut-down if they did not join Local 174 (although neither its findings, nor the evidence, indicated the source of the rumor). The Board stated that it believed the employer's favoritism to Local 174 was generally known to the employees and that they were induced thereby to abandon the strike and to affiliate with Local 174.

established to show a violation of § 8 is conduct by an employer which is defined therein as an unfair labor practice. That section does not require proof that the proscribed conduct had its desired effect.[7]

 The employer's argument points to the unanimous ratification of the closed shop agreement at a meeting on June 6, 1941, attended by all the employees involved. This, it is urged, overcame whatever effect the unfair labor practices may have had and also shows that all the employees chose Local 174 as their bargaining representative. This argument overlooks the presence at the meeting of two of the plant supervisors. One was Kijak, who, it will be remembered, told Borys to solicit members and warned him of the consequences which would otherwise ensue. The other was Engelhorn's office manager, who had participated on behalf of the employer in the negotiations leading to the closed shop agreement. Their presence and the continued effect of the prior unfair labor practices of the employer were facts to be considered by the Board in determining the validity of the ratification. The Board found the ratification was attributable to the employer's conduct in assisting Local 174 and was therefore of no effect. We think the record amply supports this conclusion. Furthermore, the proviso of § 8(3) requires that the contracting labor organization represent a majority of the employees at the time the closed shop agreement is made, not afterwards. This prerequisite was not established.

 The case is thus one where the employer negotiates a closed shop contract with a labor organization which he assisted by conduct defined by Act to be an unfair labor practice. Such a contract is invalid under the proviso of § 8(3) of the Act, National Labor Relations Board v. Electric Vacuum Cleaner Co., Inc., 1942, 315 U.S. 685, 62 S.Ct. 846, 86 L.Ed. 1120; International Association of Machinists; Tool and Die Makers Lodge No. 35, etc., v. National Labor Relations Board, 1940, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50, and cannot operate as a bar to proceedings before the Board.

Local 174 in addition to supporting the contentions made by the employer has advanced several other arguments in behalf of itself. One, presupposing the validity of the closed shop agreement under the Act and state law, claims it was beyond the power of the Board to annul it. However, the closed shop agreement is invalid under the Act and the Board could, as it did, hold it to be ineffective.

 The other argument is that the Board's order should not be enforced because its enforcement tends to interfere with, impede, and diminish the right of Local 174, to strike, contrary to § 13 of the Act, 29 U.S.C.A. § 163.[8] Implicit in this argument is the threat of a strike by Local 174 and sympathetic measures to be taken by other affiliates of the A. F. of L., in the event that the Board's order is enforced.

 Economic hardships imposed upon an employer as a result of jurisdictional labor disputes do not excuse the employer

In National Labor Relations Board v. Link-Belt Company, 1941, 311 U.S. 584, 588, 61 S.Ct. 358, 361, 85 L.Ed. 368, the Supreme Court said: "It would indeed be a rare case where the finders of fact could probe the precise factors of motivation which underlay each employee's choice. Normally, the conclusion that their choice was restrained by the employer's interference must of necessity be based on the existence of conditions or circumstances which the employer created or for which he was fairly responsible and as a result of which it may reasonably be inferred that the employees did not have that complete and unfettered freedom of choice which the Act contemplates." What the Court said there, "Here no one fact is conclusive. But the whole congeries of facts before the Board supports its findings.", could well be said here.

[7] Rapid Roller Co. v. National Labor Relations Board, 7 Cir., 1942, 126 F.2d 452, 457, certiorari denied 1942, 63 S.Ct. 45, 87 L.Ed. ——; National Labor Relations Board v. Aintree Corporation, 7 Cir., 1942, 132 F.2d 469; Humble Oil & Refining Co. v. National Labor Relations Board, 5 Cir., 1940, 113 F.2d 85, 92; National Labor Relations Board v. American Manufacturing Company, 5 Cir., 1943, 132 F.2d 740 (contempt proceeding). See, also, National Labor Relations Board v. Link-Belt Company, supra; National Labor Relations Board v. McLain Fire Brick Co., 3 Cir., 1942, 128 F.2d 393; National Labor Relations Board v. Baldwin Locomotive Works, 3 Cir., 1942, 128 F.2d 39, 50 (surveillance).

[8] "Nothing in this Act [sections 151–166 of this title] shall be construed so as to interfere with or impede or diminish in any way the right to strike."

from compliance with the Act.[9] Nor do we think that the question of the right of Local 174 to strike arises in this proceeding. Admittedly the Board's order is addressed only to the employer. It does not order Local 174 or the A. F. of L. either to do or not to do anything, let alone forbid a strike. The issue of whether or not Local 174 or any other affiliate of the A. F. of L. can call a strike or order a boycott is not before us in this proceeding. True, the Board's order does invalidate Local 174's contract with the employer. But, in doing this, the Board was merely carrying out the provisions of the Act. Local 174 was a party to the proceedings and had its opportunity to be heard on this point.

### The Unfair Labor Practices

 The Board's finding that the employer engaged in unfair labor practices within the meaning of § 8(1) of the Act is supported by the evidence. Nor is there any question that the employer unjustifiably refused to bargain with the C.I.O., the representative certified by the Board as the exclusive bargaining agent for the employees in the appropriate unit. Accordingly, the employer has engaged, as found by the Board, in unfair labor practices as defined by § 8(5) of the Act.

The Board found that on October 20, 27 and 31, 1941, respectively, the employer, upon the insistence of Local 174, discharged Louis Stevenson and Charles Banks, Copley Jackson and Alex Borys because of their failure to pay their membership dues in Local 174. No offer of reinstatement has been made to these employees. Since the closed shop agreement of May, 1941, was invalid, the employer cannot claim immunity from liability from consequences of the discharges which were made pursuant to it. Accordingly, the Board's finding that the employer has committed the unfair labor practice proscribed by § 8(3) of the Act must be sustained.

### The Order

The employer does not challenge the scope of the Board's order as distinguished from the correctness of its legal basis. It requires the employer to cease and desist from committing the unfair labor practices

found by the Board, from giving effect to any contract with a labor organization not certified by the Board, to bargain with the C.I.O. union as the representative of its employees, to offer reinstatement to the discharged employees and to make them whole for their loss of earnings, to post notices and to notify the Regional Director of compliance.

The petition of the Board for enforcement of its order is granted.

9 National Labor Relations Board v. Hudson Motor Car Co., 6 Cir., 1942, 128 F.2d 528; McQuay-Norris Mfg. Co. v. National Labor Relations Board, 7 Cir., 1940, 116 F.2d 748, 752, certiorari denied 1941, 313 U.S. 565, 61 S.Ct. 843, 85 L.Ed. 1524; National Labor Relations Board v. Star Pub. Co., 9 Cir., 1938, 97 F.2d 465, 470.