## AMERICAN NAT. BANK OF ST. PAUL v. NATIONAL LABOR RELATIONS BOARD.

### No. 12786.

Circuit Court of Appeals, Eighth Circuit.

Aug. 16, 1944.

Samuel Lipschultz, of St. Paul, Minn. (Lipschultz & Lipschultz, of St. Paul, Minn., on the brief), for petitioner.

Francis X. Helgesen, Atty., National Labor Relations Board, of Minneapolis, Minn. (Alvin J. Rockwell, Gen. Counsel, Malcolm F. Halliday, Associate Gen. Counsel, and William J. Isaacson, Atty., all of Washington, D. C., and Laurence H. Whitlow, Atty., National Labor Relations Board, of New Orleans, La., on the brief), for respondent.

Before GARDNER, JOHNSEN, and RIDDICK, Circuit Judges.

JOHNSEN, Circuit Judge.

The American National Bank of St. Paul seeks to review and set aside an order of the National Labor Relations Board. The Board asks that the order be enforced.

The Board had found that the Bank was guilty of unfair labor practices under section 8(1) and (3) of the National Labor Relations Act, 29 U.S.C.A. § 158(1) and (3), in discharging five employees for union membership and activity, and, by this and other means, in interfering with the employees' right of self-organization. The Board's order required the Bank to cease and desist from these unfair labor practices; to reinstate the five discharged employees with back pay; and to post appropriate dissipating notices.

The primary question is whether there is substantial evidence in the record from which the Board could legitimately

find that the five employees were discharged for union membership and activity. We think there is—tested by the principles of National Labor Relations Board v. Nevada Consolidated Copper Corporation, 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305, reversing 10 Cir., 122 F.2d 587; National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368; National Labor Relations Board v. Waterman S. S. Corporation, 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704; Onan v. National Labor Relations Board, 8 Cir., 139 F.2d 728; National Labor Relations Board v. Central Steel Tube Co., 8 Cir., 139 F.2d 489; and a long line of other recent similar decisions. The Bank's brief does not make reference to the Nevada Consolidated Copper Corporation case, supra—which must be accepted as controlling on a review of a general circumstantial situation such as is here involved—except to quote a portion of the opinion of the Circuit Court of Appeals in that case, whose decision the Supreme Court reversed.

We shall not attempt to set out all the circumstances in the record from which the Board's inference flowed, but only enough of the evidentiary situation to show that the inference was capable of resting upon probative substantialities and not upon mere conjectural tenebrosities, under the standards by which National Labor Relations Act cases are to be controlled on review.

In March 1943, 25 of the Bank's 90 employees held a meeting to discuss union organization. Those who were spearheading the movement had been suggesting to the other employees that the Bank's salaries should be increased, and that a union organization was the only way this could be hoped to be accomplished. Two of those who were active in doing the organizational work had been with the Bank for 16 years and were receiving salaries of $135 and $140 a month. A third had been with the Bank for 12 years and was receiving $105 a month.

A week or so after the first meeting, another meeting was held to elect officers for the Union. By that time interest in the Bank had grown to the point where 40 employees attended.

Five days after this meeting, the Bank's officers, at one of their daily conferences, peremptorily discharged the president of the Union, three persons who had been elected to serve as departmental representatives, and a fifth member who had spoken to a number of the other employees in favor of union organization.

The reason given by the officers for the discharges was incompetency and inefficiency. Two of the employees had been with the Bank since 1927, a third since 1931, and the two others for a period of six to nine months during which time they both had been given two salary increases. The union president, who was one of those that had been in the Bank's employ for 16 years, testified that when he protested that the excuse that his work was unsatisfactory "is kind of weak, isn't it?" the Bank's officer had replied, "Well, Fred, that is all I can tell you." None of the employees discharged had ever been warned that, unless his work was improved, his services would have to be dispensed with. The Bank's practice in the past had always been, not to discharge employees directly for unsatisfactory services, but to give them an opportunity to submit their resignations.

The discharges were made at a time when the Bank was admittedly short-handed due to the war situation; when the Bank's annual vacation period was approaching; and when such replacement help as the Bank had at all been able to get for some time consisted entirely of young, inexperienced girls.

Under these conditions, the Bank contended that it was simply discharging these five from its depleted staff of experienced employees, in mass, for incompetency and inefficiency, and without following its previous practice of allowing employees whose services were unsatisfactory to submit their resignations; that the officers of the Bank were not trying to choke off the union organization (and a reasonably inferable approaching demand for employee salary increases); that they did not in fact know anything about the union activities or relations of the employees discharged; and that they had no concern about whether the Bank was unionized or not.

There was testimony by two disinterested witnesses that prior to the discharges the union was being generally and spiritedly discussed among the employees during banking hours. Within a day or two after the union election, the supervisor of the Bank's stenographic department had stated to two employees that she thought a union had no place in the Bank, and that, if it came, "it would be hard for Mr. Bremer (Chairman of the Board) to take it." The

270

supervisor was not called as a witness to explain her statement, nor did Mr. Bremer take the stand to show that his union attitude had been misrepresented. One of the vice-presidents admitted in his testimony that he had "noticed employees talking together in groups among themselves"; that "it was quite apparent that there was a feeling of unrest among the employees"; that he realized that this was due to union activity; that he had been told by a representative of the American Federation of Labor that the rival C.I.O. was attempting to organize the Bank; that "we were a little surprised to learn of that activity"; and that the officers "discussed this feeling that there was in the Bank." He would not directly admit, however, that this was before the discharges were made but attempted to equivocate, saying at one point that he thought it was after the discharges; at another, that it may have been after March (the discharges occurred March 31st); at another, that it may have been in March; and at another, that "I don't remember whether we knew it then [time of discharge] or not."

There was other testimony, however, showing that sometime during the latter part of March an employee who was in charge of the time-contract payment department had reported to the comptroller of the Bank that "I think they are trying to organize a union" and had suggested, "Keep your ear to the ground," and that the comptroller had thereupon reported the matter to the cashier.

On the general and specific circumstances set out above, under the decisions previously cited, it cannot be said that there was no substantial evidence for the Board's inference that the Bank's officers knew and were concerned about the unionization efforts in the Bank at the time they made the discharges. Another incident also points to the fact that the Bank had no policy of unconcern and self-abnegation on the union question at the time of the discharges, such as is now claimed to have existed. On the afternoon of the day the discharges had been made, the union treasurer, who had not been discharged but apparently had become fearful of also losing his job, went to the comptroller and said: "Well, I'd like to know how I stand. I made a mistake and signed a union card. I am the Treasurer." The comptroller did not declare that the Bank had no interest in the union activities of any of its employees, as it is reasonable to assume he would have done if that was the Bank's fixed policy, but replied that he "didn't know anything about it and had no authority but * * * would take it up at the officers' meeting the next morning." The employee asked him to get a definite answer, as "I'd like to know." At the officers' meeting the following morning, the cashier first reported that he had discharged the five employees as directed. The comptroller then brought up the inquiry made by the treasurer of the Union. In the face of the direct question, the officers instructed the comptroller to tell him "that the fact that he had signed a union card or anyone signing a union card made no difference. The thing that was considered was how they had been handling their job around the bank." But the fact would be entitled to be regarded as not being without significance that the comptroller who was shown to have attended most of the officers' meetings (though not the one on March 31st) was afraid to assume the responsibility of assuring an employee that his union activity would not possibly enter into his employment relationship, and that he felt that any such question would have to be brought up at an officers' meeting.

Finally, the record shows that the Board weighed the testimony of the discharged employees as to the history of their past relations with the Bank, as against the testimony of the Bank's officers on previous incidents of dissatisfaction with the employees' services, and found that the testimony of the officers was "vague and indefinite"; that "the few specific errors [in the employees' work] which were pointed out were not of a nature or frequency which customarily lead to the severe penalty of discharge"; that "all of the errors upon which the (Bank) relied occurred some time before the employees engaged in union activity, some of them as much as several years before that time";[1] and that the Bank's officers had difficulty in testifying about what had occurred at the meeting when the discharges were ordered, and "although they were repeatedly asked to

[1] As an illustration, the officer under whose supervision the president of the Union had worked immediately preceding his discharge did not testify as to the quality of his work, nor is it shown that he had made any complaint regarding it to the Bank's other officers.

state what occurred at the conference * * * they appeared unable to do so." From all of the evidence, the Board concluded that the discharges were not actually controlled by good-faith motives of service dissatisfaction; that the resurrected incidents of past unsatisfactoriness were mere "pretexts to cloak the real motive"; and that "the one common denominator of the dischargees was their union activity."

■ The Board thus weighed and appraised the totality of the situation, as it had a right to do, on the questions of the Bank's knowledge of the union activities; its concern in the matter; its real union attitude, in relation to its unprecedented mass-discharge action judged by its previous practices and the existing labor shortage, and to the equivocation of one of the officers as to just how much it knew at the time the discharges were made; and its actual motive in the light of its attempt to resurrect minor and long-past incidents and the absence of any immediate, fair-play admonition. Its inferences cannot be regarded as being unsupported by substantial circumstantial evidence and so cannot be said to be unreasonable in the situation. And, as we have previously suggested, the matters which we have set out here do not purport, of course, to cover all the details in the record upon which the Board relied.

■ The Board clearly also was warranted in holding that the anti-union expressions of the supervisor of the Bank's stenographic department constituted an interference with, restraint, and coercion of the employees' rights guaranteed them under the Act, in violation of section 8(1), 29 U.S.C.A. § 158(1). The question in the situation is not, as the Bank contends, whether the statements actually had had such a specific effect, but whether they reasonably might be found to tend to have any such effect. National Labor Relations Board v. John Engelhorn & Sons, 3 Cir., 134 F.2d 553, 556, 557; National Labor Relations Board v. American Mfg. Co., 5 Cir., 132 F.2d 740, 742, certiorari denied 319 U.S. 743, 63 S.Ct. 1030, 87 L.Ed. 1700; Rapid Roller Co. v. National Labor Relations Board, 7 Cir., 126 F.2d 452, 457.

On the record before us, the Board's order is entitled to be enforced.

RIDDICK, Circuit Judge (dissenting).

I cannot agree with the decision in this case. I find no substantial evidence in the record to support the conclusion reached by the board. That conclusion, it seems to me, rests entirely upon the inference, without foundation in the evidence, that the officers of the bank who had no personal contact with the discharged employees knew of their interest in the formation of a union among the bank's staff, and upon the further inference, based wholly upon the first, that the discharges were ordered solely because of union activities.

The burden on the controlling question in the case was not upon the bank. It was upon the board. No witness testified that any officer of the bank was advised of union activity among the bank's employees prior to the discharges involved in this case. No witness testified that any of the bank's officers were aware that the discharged employees were participating in the movement for the organization of a union. The five officers of the bank who participated in the conference which resulted in the discharges were the president, vice-president, cashier, assistant cashier, and comptroller. Each of them denied any knowledge of the formation of the union or any knowledge that either of the discharged employees was in any way concerned with it. Each of them testified that the discharges were made after consideration of the records of the employees discharged and on the conclusion that they were incapable of efficiently performing their work in the situation which confronted the bank at the time the discharges were made. The final decision was made by the president of the bank on the faith of the reports given to him by the other officers of the bank whom he consulted. Those officers in turn made their recommendations on the reports of the department heads familiar with the work of the discharged employees. I think it sufficient to say that the evidence in this record, in my opinion, justified the conclusion reached concerning the efficiency of the discharged employees, but whether the decision in this respect was right or wrong is of no importance on the controlling question in this case, in the absence of any evidence to show that it was not reached in good faith. Neither this court nor the board may properly disregard the testimony of credible witnesses, which, it seems to me, is without contradiction.

In reaching this conclusion I have not overlooked two matters which were given weight by the board and by the majority

272

of the court. One of these was the conversation between a Miss Aimee Bougie and certain of the young women employees of the bank and the failure of the bank to call the chairman of its board of directors as a witness. Miss Bougie's duties as an employee of the bank were to give tests to young women who applied for employment as stenographers. After the first meeting of employees to consider the formation of a union, a number of the young women employees of the bank who had attended the meeting told Miss Bougie about it. In the course of the conversation Miss Bougie expressed the opinion that the chairman of the bank's board of directors would hate to see a union in the bank. That was merely Miss Bougie's opinion. That she had any information concerning the board chairman's opinion on the subject or any opportunity to acquire information concerning it is not intimated. She did not begin the conversation in which the remark was made. She had been instrumental in securing positions in the bank for some of the young women present. They freely discussed the matter with her, and after the conversation in question continued their interest in the formation of a union. There is no evidence that the board chairman had anything to do with the decision to discharge any of the bank's employees, or any knowledge of it, or that Miss Bougie's remark was intended or effective to deter the organization of a union. The question was freely discussed among the bank's employees. Miss Bougie was not alone in doubting the value of the union. The discharge of minor employees was hardly a matter for the consideration of the board of directors of a large bank. In this situation, the failure of the bank to call the chairman to testify as to his opinions concerning labor unions seems to me a matter of no significance. Equally amazing to me is the weight given to the fact that these minor employees were not given an opportunity to resign instead of being discharged. I am unable to see any difference in actual effect between asking a minor, clerical employee in a bank for his resignation, and in advising him that he was given a vacation with pay, and that thereafter his services would no longer be needed.

I think the conclusion of the board was based wholly upon inference, without basis in the evidence, and that its order should be set aside.